## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

MATHEW HIGGINS,

                Plaintiff,

v.

UNITED STATES STEEL
CORPORATION,

                Defendant.

Case No. 23-cv-2730 (LMP/LIB)

**ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

Alicia L. Anderson, **The Law Office of Alicia L. Anderson, Edina, MN**, for Plaintiff.

Elaine E. Luthens, **Jackson Lewis P.C., Minneapolis, MN**; Michael J. Moberg, **Taft Stettinius & Hollister, LLP, Minneapolis, MN**; and Rodney M. Torbic, **Law Department – United States Steel Corporation, Pittsburgh, PA**, for Defendant.

Plaintiff Mathew Higgins began working for Defendant United States Steel Corporation ("USS") in 2011. The USS facility where Higgins worked had a policy requiring its employees to provide advance notice if they would be late to or absent from their scheduled shifts. USS terminated Higgins's employment in April 2023 after multiple instances in which Higgins did not provide timely notice of his tardiness or absence. Higgins contends that he could not consistently adhere to the policy due to a debilitating medical condition for which he was approved to take intermittent leave under the Family Medical Leave Act ("FMLA"). Higgins asserts that USS discriminated against him on the basis of his disability, failed to offer a reasonable accommodation to him, and retaliated against him for requesting reasonable accommodations in violation of the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA"). Higgins also

alleges that USS interfered with his rights under the FMLA and retaliated against him for his use of FMLA leave.

USS moves for summary judgment on Higgins's claims. For the reasons discussed below, USS's motion for summary judgment is granted, and Higgins's claims are dismissed.

## BACKGROUND

Higgins has suffered from migraines since before he was employed by USS, and the medications he takes to treat them cause him to experience symptoms of irritable bowel syndrome ("IBS"). ECF No. 30-1 at 26:4–25, 29:9–30:14. Some of those medications also cause Higgins to experience drowsiness, decreased cognitive function, and forgetfulness. *See id.* at 31:4–32:13.

Higgins started working for USS in 2011 at its Minntac mining facility in Mountain Iron, Minnesota. *Id.* at 18:17–20; *see* ECF No. 30-6 at 2. Higgins worked in various roles before eventually taking a position as a diesel mechanic in Minntac's Mobile Equipment Shop ("MES") in 2017. *See* ECF No. 30-1 at 19:7–20:2; ECF No. 30-6 at 2. Higgins typically was assigned to perform equipment repairs in the MES and, on occasion, in the field. ECF No. 30-3 at 16:17–21.

At all times relevant to this case, Higgins was a member of the United Steelworkers Union ("USW"). *See* ECF No. 30-1 at 22:23–25; ECF No. 29 at 2. USS is party to a Basic Labor Agreement ("BLA") with USW. *See, e.g.*, ECF No. 33-2. The BLA establishes a three-step grievance procedure by which USS employees who were USW members may raise concerns they have relating to their employment with USS or dispute any disciplinary

action USS takes against them. *See id.* at 2–4. The BLA also authorizes USS to suspend or discharge a USW member-employee if USS determines that the employee's conduct justifies such disciplinary action. *Id.* at 9–12. Employees who are suspended or discharged may file a grievance and request a preliminary hearing ("9B Hearing") within five days of receiving notice of the suspension or discharge. *Id.* at 10–11. Employees who timely file grievances may remain on the job until the grievance is resolved, but if a discharged employee who remains on the job during the grievance process is disciplined a second time for the same offense, the employee is no longer eligible to remain in their position until the grievance process concludes. *Id.* at 11.

The BLA also contains an absenteeism provision which requires employees to adhere to their schedules and to contact USS "as promptly as possible" if they have "just cause to be late for or absent from work." ECF No. 33-3 at 3. The BLA permits USS to develop "[r]easonable rules for the implementation" of the absenteeism provision. *Id.* In accordance with that provision, USS required employees at the Minntac facility to provide notice at least twenty minutes before the start of their shifts regarding any tardiness to or absence from work (the "Absenteeism Policy"), *see* ECF No. 30-5 at 20:24–21:1, but the Absenteeism Policy was not provided to employees in a written document, *see* ECF No. 30-3 at 28:3–7. If an employee's absence or tardiness was due to a health or medical issue, USS generally required the employee to provide documentation from a medical provider stating that the employee was unable to work their shift. *See* ECF No. 30-4 at 75:24–76:4.

Generally, Minntac's MES day-shift managers finalized mechanics' work assignments by about 5:30 AM, thirty minutes before day-shift mechanics, like Higgins, were scheduled to arrive for their regular shifts. ECF No. 30-3 at 11:16–21, 36:20–37:2. Shift managers held "lineup" meetings at the beginning of each shift where they informed the mechanics of their specific job assignments, which could change day-to-day. *Id.* at 11:22–12:25. Adherence to the Absenteeism Policy was important to MES management because the later a mechanic notified USS of their tardiness or absence, the less time MES managers had to reassign other mechanics as necessary to account for the tardy or absent mechanic. *Id.* at 37:3–7; ECF No. 30-4 at 48:14–20.

On February 3, 2016, USS issued a written warning to Higgins for violating the Absenteeism Policy. ECF No. 30-7 at 2. Higgins filed a grievance on February 8, 2016, and pursuant to the BLA's grievance process, USS held a 9B Hearing with Higgins on March 17, 2016. ECF No. 32-1 at 2. USS's records of that 9B Hearing show that Higgins was late to or absent from work five times between February 2015 and January 2016 without having provided timely notice. *Id.* Higgins cited "illness" as the reason for his absenteeism in those instances, *id.*, but Higgins does not recall—and USS's records do not expressly state[1]—whether those instances were related to Higgins's migraines or IBS, ECF No. 30-1 at 64:2–15. USS denied Higgins's grievance, but advised Higgins that he could

---

[1]    USS's records of the 9B Hearing state that Higgins presented "a generic excuse from his treating physician" that Higgins was "unable to operate heavy equipment or machinery" while using one of the medications Higgins uses to manage his migraines. ECF No. 32-1 at 2; *see* ECF No. 30-1 at 29:9–13.

apply for intermittent FMLA leave if he would regularly need time off work because of his migraines.  ECF No. 32-1 at 2; *see* ECF No. 30-1 at 38:3–5.

Higgins first requested intermittent FMLA leave in or around fall 2017.  *See* ECF No. 30-1 at 37:20–24; ECF No. 30-8 at 2.  Higgins's request was approved, and he was permitted to take FMLA leave up to twice per month for up to two days in each instance. ECF No. 30-8 at 2.  Higgins reapplied, and was approved, for intermittent FMLA leave each year throughout the remainder of his employment with USS.  *See generally* ECF No. 30-9; *see also* ECF No. 30-1 at 115:18–116:5.  Each approval notice that Higgins received included instructions that Higgins should "[f]ollow the required call-off procedure" for his department regardless of whether his leave was foreseeable or unexpected.  *See, e.g.*, ECF No. 30-9 at 4.  In 2020, USS retained a third-party company, Broadspire, to handle administration of FMLA leave for USS employees.  *See* ECF No. 30-1 at 46:14–17.

On January 23, 2020, Higgins's supervisor at that time, Casey Uggerud, emailed USS Labor Relations leadership, including Susan Wiirre, to report that Higgins was late for his shift and had not given timely notice under the Absenteeism Policy.  *See* ECF No. 32-3 at 2.  Uggerud noted that it was Higgins's second tardy that month and that "he had more in December [2019]."  *Id.*  The same day, Ryan Frederick, Minntac's MES Coordinator, instructed a colleague in the MES to remind Higgins of his responsibility to adhere to the Absenteeism Policy, regardless of whether his tardiness was excused as FMLA leave, and to issue Higgins a one-day suspension. ECF No. 32-4 at 2–3.  Higgins's noncompliance with the Absenteeism Policy continued, and in April 2020, Uggerud

5

expressed frustration to Frederick that the discipline imposed on Higgins to that point had not resulted in consistent or meaningful improvement of Higgins's untimely call-offs, noting that "[w]e already had our plans in place and had to change things again."  *See* ECF No. 37-1 at 2.

Around the same time, Uggerud agreed to assign Higgins primarily to the Minntac facility's "service stall," where he was tasked with performing planned inspections and routine maintenance on USS's equipment, so that it would be easier to replace Higgins if he was unable to come to work on time.  *See* ECF No. 30-1 at 130:19–25, 181:7–25; *see also* ECF No. 30-3 at 14:11–23.  But the work at the service stall typically required two mechanics, so Higgins's absences and tardiness without timely notice caused hardship to USS and the MES because Higgins's supervisors would "have to find someone else to do that work," which could require MES supervisors to choose between "abandoning working on [a] piece of equipment" or abandoning the planned inspections and maintenance at the service stall entirely for that shift.  *See* ECF No. 30-3 at 17:12–19:18.

On July 1, 2020, after Higgins again violated the Absenteeism Policy, Frederick emailed Wiirre asking "what, if anything, [USS] can do about these late call offs" and explaining that he "had multiple conversations" with Higgins about the need to provide advance notice but "[hadn't] been able to get through to him."  ECF No. 32-5 at 2–3; *see also* ECF No. 30-3 at 28:10–18.  Wiirre told Frederick to "issue discipline accordingly."  ECF No. 32-5 at 2.  USS issued Higgins a three-day suspension for violation of the Absenteeism Policy seven days later.  *See* ECF No. 30-12 at 2.  Higgins filed a grievance related to that suspension, and a 9B Hearing involving Higgins and USS representatives,

6

including Frederick, was held on July 23, 2020. *See* ECF No. 36 ¶ 5. In that 9B Hearing, Frederick again explained to Higgins that Higgins was required to provide timely notice of his tardiness or absence, even if it was excused FMLA leave, so that Higgins's supervisors could plan work assignments for other mechanics accordingly. *Id.* Higgins explained that he sometimes had difficulty timely reporting his absences due to his migraines and IBS and that, in this instance, he had fallen asleep due to being in pain throughout the previous night.[2] *Id.*; ECF No. 36-1 at 2.

In or around August 2020, Higgins submitted a note from Dr. Jeffrey Copeman, one of his medical providers, stating that Higgins has a history of chronic and recurring migraines and that the medication Higgins was prescribed to treat his migraines causes IBS. ECF No. 31-1 at 2. Dr. Copeman explained that Higgins's migraine and IBS symptoms are "unpredictable" and may be severe and debilitating, which "may result in [Higgins's] inability to adhere to call off procedure at times." *Id.* Wiirre learned of Dr. Copeman's note and its contents at some point during a 9B Hearing with Higgins, though it is not clear exactly when or at which hearing. *See* ECF No. 30-4 at 22:13–23:7.

Higgins's non-compliance with the Absenteeism Policy began to occur more frequently in 2022. *See* ECF No. 30-10 at 2–7. By that time, Higgins asserts that his understanding of the Absenteeism Policy was to "call as soon as [he] knew" he would not be able to report for his shift. ECF No. 30-1 at 71:18–72:6; *see* ECF No. 46-3 at 2. Higgins

---

[2]    The July 8 suspension was later withdrawn by USS. *See* ECF No. 36 ¶ 6; ECF No. 36-2 at 2.

says that expectation was communicated to him by Nicole Koski, a USS Labor Relations Representative, during a 9B Hearing, though he cannot say precisely when or during which hearing Koski made that statement. ECF No. 30-1 at 71:23–73:17. Higgins believed this relaxed expectation was an accommodation for his medical condition. *Id.* at 80:24–81:4.

In January 2022, Corey Hartling, a USS Area Manager, asked Wiirre how many hours Higgins worked in 2021 relative to how many he was scheduled to work because Higgins was "constantly calling off on FMLA." ECF No. 43-15 at 4. Wiirre responded that Higgins had used fifty-nine of the sixty days available to him in accordance with his approved FMLA leave. *See id.* In that exchange, which also included Jody McKernan, a member of USS's Integrated Disability Management team, Wiirre stated, "It looks like [Higgins] has had approved claims for several years. This is becoming a hardship to the department." *See id.* at 3.

In April 2022, after Higgins was again disciplined for violation of the Absenteeism Policy, *see* ECF No. 30-14 at 2, Higgins filed an ethics complaint with USS alleging that Koski had "discriminated against, harassed, intimidated, and retaliated" against him by issuing discipline notices for times he provided late notice that he would not be able to work his shift, ECF No. 33-4 at 4–6; ECF No. 32 ¶ 11. Wiirre investigated Higgins's complaint, including by interviewing Higgins. ECF No. 32 ¶ 11. Higgins told Wiirre that he "[could] not follow the departmental call off procedure" due to his medical condition. *See* ECF No. 33-4 at 5. Wiirre asked Higgins why "he could call 3 minutes to the hour, or shortly after the hour, but was unable to call off 20 minutes prior to the hour," to which Higgins responded that "he [did] not know how much pain he [would] be in or if he [would]

8

be incapacitated due to the medications he [had] been prescribed."[3]  *Id.*  Regarding Higgins's specific accusations of discriminatory and retaliatory conduct by Koski, Wiirre "stressed that . . . Koski[] was simply explaining the department[']s call off requirements" and that "not following the [call-off] procedure constitutes absenteeism."  *Id.*  Wiirre ultimately was unable to substantiate Higgins's complaints.  *Id.*; ECF No. 32 ¶ 11.

On April 18, 2022, Koski emailed Frederick directing him to "update [Higgins's] FM codes[4] to reflect the number of hours he was off ASAP" because she had been in contact with USS headquarters that day "to discuss [Higgins's] situation and took a lot of [flak] for not having accurate information to Broadspire."  ECF No. 43-16 at 2; *see* ECF No. 30-5 at 36:11–20.  McKernan subsequently followed up on the January 2022 email exchange regarding the tracking of Higgins's FMLA leave to provide instructions for managers to enter such leave time correctly and indicated that Broadspire had four recorded FMLA-related absences for Higgins to that point in 2022.  *See* ECF No. 43-15 at 2.  Koski responded that "there should be more days listed than what Broadspire has."  *Id.*; *see* ECF No. 30-5 at 31:13–32:6.  The discrepancy appears to have been caused by the system USS used to enter and track FMLA leave because it only allowed managers to enter such leave in eight-hour increments.  *See* ECF No. 30-5 at 32:10–33:21.  In situations where an

---

[3]    USS's records of a 9B Hearing held on April 14, 2022, signed by Koski, also notes that Higgins could not provide an "explanation for why his sudden incapacitation doesn't occur at work."  ECF No. 32-2 at 3.

[4]    "FM" codes were used to indicate an employee had taken FMLA leave.  *See* ECF No. 30-5 at 36:11–15.

employee used FMLA leave for fewer than eight hours of missed work, managers recorded the leave with an "FM code" but entered zero hours. *See id.*

In early September 2022, Broadspire sent a notice to Higgins stating that he had exhausted his FMLA entitlement as of August 4, 2022, ECF No. 30-15 at 2, though Higgins does not recall receiving the notice, ECF No. 30-1 at 54:1–15. On September 21, 2022, Koski contacted a USS accounting analyst and asked him to convert entries in Higgins's time records indicating FMLA leave dating back to September 2021 from "0.0" hours missed to "8.0." ECF No. 43-17 at 3. The analyst responded that Koski would need to provide the information directly to Broadspire to update any entries that predated January 2022. *See id.* at 2. Later that day, Koski emailed McKernan to report that Higgins's manager corrected Higgins's time entries dating back to January 1, 2022. ECF No. 43-18 at 2. McKernan then reported to Broadspire that those changes had been made and that USS was "trying to establish on a more updated basis when people exhaust" their FMLA leave. *Id.* As it specifically relates to Higgins, McKernan noted that "Higgins [had] been on FMLA leave for years and his time used [was] considerable" and in ways USS found to be "abusive," and that USS needed "to make sure I's are dotted and t's crossed." *Id.* Broadspire subsequently sent Higgins a second notice dated October 4, 2022, indicating that Higgins had exhausted his FMLA leave as of June 13, 2022. ECF No. 30-16 at 2.

Higgins met with Wiirre on September 28, 2022, and Wiirre informed Higgins of the September 2022 notice from Broadspire regarding exhaustion of his FMLA leave. ECF No. 30-4 at 70:6–71:4; *see also* ECF No. 30-1 at 54:16–55:2; ECF No. 32-8 at 2–5. Wiirre explained that from that point until Higgins became eligible to use FMLA leave again,

10

Higgins would need to "clearly provide information that establishe[d] his inability to work" in the event Higgins was unable to work any part of his shifts. ECF No. 30-4 at 70:17–71:4; *see also* ECF No. 32-8 at 2; ECF No. 30-1 at 54:16–55:2. Wiirre also reminded Higgins that he was expected to notify USS that he would be unable to work at least twenty minutes before his shift was scheduled to begin. ECF No. 30-1 at 54:16–56:9.

On seventeen occasions between September 14 and November 2, 2022, Higgins was absent, tardy, or left early from his shift without cause, including seven instances in which Higgins did not timely report that he would be unable to work his shift. *See* ECF No. 32-8 at 3–4. On November 8, 2022, USS issued twenty-four five-day suspensions subject to discharge for violations of the Absenteeism Policy. *See generally* ECF No. 30-17; *see also* ECF No. 30-10 at 2–7. Higgins submitted documentation relating to some, but not all, of his absences during that period, *see generally* ECF No. 31-3, and some of the documents indicated Higgins missed work or left early for issues unrelated to his medical condition, like veterinary appointments for his dog or medical appointments for his children, *see id.* at 3–4, 13–15.

Higgins filed grievances relating to the November 2022 disciplinary notices, and a 9B Hearing was held on November 16, 2022, which included Higgins and Wiirre. *See* ECF No. 32-7 at 2. Either at that meeting or over the course of the various 9B Hearings held with Higgins, Higgins recalls that USS offered suggestions to Higgins to help improve his compliance with the Absenteeism Policy, including having his wife call on his behalf if Higgins was unable to do so or scheduling a later start time for Higgins's 6 A.M. shifts. *See* ECF No. 30-1 at 102:13–103:22; ECF No. 30-4 at 48:1–49:4. Wiirre testified that

Higgins was not receptive to those suggestions and did not offer any of his own. *See* ECF No. 30-4 at 49:5–50:4. Higgins testified that the only accommodation he requested was that he should be permitted to provide notice that he would be unable to make it to work as soon as he was able without having to comply with the twenty-minute advance-notice requirement of the Absenteeism Policy. *See* ECF No. 30-1 at 191:8–16.

On November 22, 2022, USS notified Higgins that twenty-two of the twenty-four suspensions he received on November 8 were converted to discharge.[5] ECF No. 30-18 at 2. In accordance with the BLA, Higgins was permitted to remain in his position through the pendency of the grievance process. *See id.* Around the same time, Higgins attempted to work with Broadspire to find out how to ensure his FMLA leave had been recorded accurately because, in some instances, he "was charged eight hours [of] FMLA" when he "only missed a matter of minutes." ECF No. 30-1 at 196:16–197:8; *see* ECF No. 43-19 at 2. Higgins contends that Broadspire was generally unresponsive to his requests, but Broadspire eventually instructed him to file a new FMLA claim. ECF No. 30-1 at 196:16–197:8. On March 30, 2023, Broadspire notified USS that Higgins had initiated the approval process for a new FMLA claim. *See* ECF No. 43-20 at 2.

Between January 2023 and April 2023, while the grievance process relating to the November 2022 suspensions was pending, Higgins received three additional discipline notices for violations of the Absenteeism Policy, resulting in Higgins being issued

---

[5]     One was revoked, and another was affirmed as a suspension without being converted to discharge. *See* ECF No. 30-18 at 2.

suspensions subject to discharge for each.  *See* ECF No. 30-19 at 2; ECF No. 30-21 at 2–3.  USS permitted Higgins to continue working in his position after the first violation, but on April 25, 2023, USS converted the latter two to discharge and prohibited Higgins from continuing to work at USS during the remainder of the grievance process, in accordance with the BLA.  *See* ECF No. 30-22 at 2; ECF No. 33-2 at 11.  Higgins did not return to his position with USS after that point.  *See* ECF No. 30-1 at 109:17–110:3.

Higgins filed suit against USS on September 6, 2023.[6]  *See* ECF No. 1.  Higgins alleges USS (1) discriminated against him on the basis of, and failed to accommodate, his disability in violation of the ADA, 42 U.S.C. § 12112(a)–(b), and the MHRA, Minn. Stat. § 363A.08, subds. 2, 6; (2) retaliated against him for requesting reasonable accommodations in violation of the ADA, 42 U.S.C. § 12203, and the MHRA, Minn. Stat. § 363A.15; and (3) interfered with his right to take FMLA leave in violation of the FMLA, 29 U.S.C. § 2612(a).  *See id.* ¶¶ 37–72.  USS denies Higgins's allegations and moves for summary judgment as to its liability for all of Higgins's claims.  ECF No. 27.

## ANALYSIS

### I.    Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  On a motion for summary judgment, "facts must be viewed in the

---

[6]    USS does not dispute that Higgins exhausted his administrative remedies with the Equal Employment Opportunity Commission prior to filing suit.  *See* ECF No. 1 ¶¶ 34–35.

light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). The nonmoving party may not defeat a meritorious summary judgment motion with mere allegations or denials, but rather "must substantiate [his] allegations with sufficient probative evidence that would permit a finding in [his] favor on more than mere speculation or conjecture." *Carter v. Pulaski Cnty. Special Sch. Dist.*, 956 F.3d 1055, 1059 (8th Cir. 2020) (citation omitted). Courts deciding motions for summary judgment "must not weigh evidence or make credibility determinations." *Sanimax USA, LLC v. City of South St. Paul*, 95 F.4th 551, 558 (8th Cir. 2024) (internal quotation marks omitted) (citation omitted). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586 (citation omitted).

## II.    ADA and MHRA Claims

Both the ADA and the MHRA prohibit employers from discriminating against qualified employees on the basis of disability. *See* 42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2; *see also Anderson v. KAR Glob.*, 78 F.4th 1031, 1036 (8th Cir. 2023) (citation omitted). Such discrimination includes an employer's failure to provide reasonable accommodations for otherwise qualified employees with known physical or mental limitations, *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 409 (8th Cir. 2018), and retaliating against employees for requesting an accommodation, *Anderson*, 78 F.4th at 1036 (citations omitted). "Claims arising under the MHRA are analyzed using the same standard applied to ADA claims," so courts review the claims simultaneously. *Brunckhorst v. City*

14

*of Oak Park Heights*, 914 F.3d 1177, 1182 (8th Cir. 2019) (cleaned up) (quoting *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 n.3 (8th Cir. 2003)).

      In employment discrimination cases where, as here, an employee identifies no direct evidence of discrimination, the employee's claims are analyzed under the *McDonnell Douglas* burden-shifting framework.[7] *Johnson v. Westinghouse Air Brake Techs. Corp.*, 104 F.4th 674, 677 (8th Cir. 2024); *accord McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To survive USS's motion for summary judgment under the *McDonnell Douglas* framework, Higgins "must satisfy a prima facie case of discrimination." *Johnson*, 104 F.4th at 677 (citing *McDonnell Douglas*, 411 U.S. at 802). If Higgins does so, "[t]he burden then shifts to [USS] to articulate some legitimate, nondiscriminatory reason for [its] actions." *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010) (quoting *McDonnell Douglas*, 411 U.S. at 804). "If [USS] articulates such a reason, the burden returns to [Higgins] to show [USS's] justification is a pretext." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804). To establish pretext:

> [Higgins] must present sufficient evidence to demonstrate both that [USS's] articulated reason for the adverse employment action was false and that discrimination was the real reason . . . . [Higgins] must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination.

*Id.* (quoting *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008)).

---

[7]    Higgins does not dispute that there is no evidence of direct discrimination or that the *McDonnell Douglas* framework applies. *See* ECF No. 45 at 16–23.

In short, summary judgment on Higgins's ADA and MHRA claims in favor of USS is proper if Higgins "fails to establish any element of [his] prima facie case." *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998) (citation omitted). As explained below, Higgins cannot establish a prima facie case of disability discrimination, so both his disability discrimination and failure-to-accommodate claims fail. And because Higgins did not offer arguments or otherwise attempt to rebut USS's motion for summary judgment as to his retaliation and reprisal claims, he has forfeited those claims.

## A.    Disability Discrimination and Failure to Accommodate

To withstand USS's motion for summary judgment as to his disability discrimination and failure-to-accommodate claims, Higgins "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Hopman v. Union Pac. R.R.*, 68 F.4th 394, 396 (8th Cir. 2023) (citation omitted); *see Wilking*, 153 F.3d at 873. To establish a prima facie case of disability discrimination, Higgins "must show that he (1) has a 'disability' within the meaning of the ADA, (2) is a 'qualified individual' under the ADA, and (3) 'suffered an adverse employment action as a result of the disability.'" *Goosen v. Minn. Dep't of Transp.*, 105 F.4th 1034, 1040 (8th Cir. 2024) (quoting *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 711 (8th Cir. 2003)).

For the purposes of its motion, USS does not dispute that Higgins has a disability within the meaning of the ADA. *See* ECF No. 29 at 19–22. Rather, USS argues that Higgins's prima facie case fails because he cannot show he was a "qualified individual" under the ADA. *See id.* The Court agrees.

16

To show that he was a qualified individual, Higgins must show that he "(1) possesses the skill, education, experience, and training the position requires, and (2) can perform the essential job functions, with or without reasonable accommodation." *Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 456 (8th Cir. 2022) (citing *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013)). "Essential functions of the job are 'fundamental job duties,' and the employer's judgment in this regard is considered 'highly probative.'" *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 670 (8th Cir. 2019) (quoting *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004)). As relevant here, courts also consider "written job descriptions prepared before advertising or interviewing applicants for the job" and "the consequences of not requiring the incumbent to perform the function." *Id.* (quoting *Kammueller*, 383 F.3d at 786); *see also Dropinski v. Douglas County*, 298 F.3d 704, 709 (8th Cir. 2002) (citation omitted) ("[T]he consequence of not requiring [an employee] to perform these functions demonstrates that they are, indeed, essential.").

USS does not dispute that Higgins had the skills and experience necessary for his position. USS instead argues that compliance with the Absenteeism Policy was an essential function of Higgins's job and that Higgins's many violations of the Absenteeism Policy show Higgins was unable to fulfill the requirements of that essential function. ECF No. 29 at 20–22. USS points to the job description for Higgins's diesel mechanic position, which emphasizes the importance of punctuality, and highlights testimony and statements from Wiirre, Frederick, and Higgins's supervisors expressing frustration about the impact Higgins's late notice of absences from scheduled shifts had on USS's operations. *Id.* at 20–21. USS also notes that it repeatedly disciplined Higgins for violating the Absenteeism

17

Policy between 2020 and 2023, which further indicates USS considered compliance with the Absenteeism Policy to be essential. *Id.* at 21.

Higgins disputes that compliance with the Absenteeism Policy was an essential function of his job and contends that "[t]here is no evidence in the record that he failed to get his work done or that any equipment repairs were delayed because of when Higgins called off." ECF No. 45 at 19–20. Higgins argues that because he "worked with ninety to one hundred other mechanics who could fill in for him if needed," there was no impact to USS's operations such that Higgins's regular and consistent attendance was essential for his job. *See id.* at 20.

USS is plainly correct. The Eighth Circuit has "consistently stated that regular and reliable attendance is a necessary element of most jobs." *Higgins*, 931 F.3d at 670 (internal quotation marks omitted) (citation omitted); *see also Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 546 (8th Cir. 2021) (alteration in original) (quoting *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 850 (8th Cir. 2002)) ("[A]n employee who is unable to come to work on a regular basis is unable to satisfy any of the functions of the job in question, much less the essential ones."). Here, the job description for Higgins's diesel mechanic position expressly states that "[t]he position requires punctuality [and] consistent attendance . . . for the success of [USS's] operations." ECF No. 30-6 at 2. Frederick, Wiirre, and Higgins's supervisors each explained the ways in which Higgins's noncompliance with the Absenteeism Policy affected USS's operations. *See, e.g.*, ECF No. 30-4 at 29:16–30:4; ECF No. 30-3 at 14:1–10; ECF No. 37-1 at 2–3. And USS gave repeated warnings to Higgins and issued discipline on numerous occasions relating to

18

Higgins's noncompliance with the Absenteeism Policy.  *See, e.g.*, ECF No. 30-11 at 2; ECF No. 30-12 at 2; ECF No. 30-13 at 2; *see also Higgins*, 931 F.3d at 670 (citation omitted) (stating an employer's "repeated warnings to [an employee] that his poor attendance was unacceptable further indicate that [the employer] considered job attendance to be an essential function").  The fact that USS could mitigate Higgins's absences "does not create a material question of fact regarding whether job attendance is an essential function." *Higgins*, 931 F.3d at 670 (citations omitted); *see Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 777 (8th Cir. 2001) ("Even though [the employer's] system of scheduling appears quite flexible, [the employer's] policy requires regular, reliable attendance, and [the employee's] job was full-time."); *see also Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999) ("[Employee] . . . disputes that attendance is essential to [his employer] since there are numerous employees and the company accounts for possible absences.  We are not persuaded by such a conclusory argument . . . .").

Having established that compliance with the Absenteeism Policy was an essential job function, and, given the extensive record of Higgins's noncompliance (which is undisputed), the Court concludes that Higgins was not qualified to perform the essential functions of his job without reasonable accommodation.  *See Higgins*, 931 F.3d at 671. The analysis thus turns to whether Higgins could perform that function *with* a reasonable accommodation.  *See Mobley*, 53 F.4th at 456.  "An individual requesting an accommodation must 'make a facial showing that reasonable accommodation is possible and that the accommodation will allow [him] to perform the essential functions of the job.'" *Higgins*, 931 F.3d at 671 (quoting *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 544 (8th

Cir. 2018)). "An accommodation is not reasonable if it requires an employer to 'reallocate or eliminate the essential functions of a job.'" *Id.* (quoting *Faulkner v. Douglas County*, 906 F.3d 728, 733 (8th Cir. 2018)).

USS contends that the only accommodation Higgins ever requested was for USS to excuse him from compliance with the Absenteeism Policy entirely, which USS argues is "unreasonable as a matter of law." ECF No. 29 at 21 (citation omitted). Higgins does not meaningfully dispute that Higgins only requested to be excused from compliance with the Absenteeism Policy, but he frames the request as one for "understanding and flexibility" as it relates to his medical condition. ECF No. 45 at 9.

Again, USS is correct. Higgins's requested accommodation was unreasonable for at least two reasons. First, Higgins's request to be permitted to call off late from his shifts was unreasonable "because it would require [USS] to reassign other [USS mechanics] to shifts that they would not have otherwise been scheduled to work." *Higgins*, 931 F.3d at 671 (citation omitted); *see Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 916 (8th Cir. 2013) (noting that an accommodation is unreasonable if it requires an employer to "reassign existing workers to assist [the employee] in his essential duties").

Second, Higgins's "requested accommodation essentially amounts to an 'unlimited absentee policy,' which is unreasonable as a matter of law." *Higgins*, 931 F.3d at 672 (quoting *Lipp*, 911 F.3d at 546); *see also Lipp*, 911 F.3d at 546 (citing *Brannon v. Luco Mop Co.*, 521 F.3d 843, 849 (8th Cir. 2008)) ("[T]he ADA does not require employers to provide an unlimited absentee policy."). Such an accommodation would effectively eliminate essential functions of Higgins's job—that is, compliance with the Absenteeism

Policy and regular, consistent attendance—which an employer need not do to accommodate an employee with a disability. *Lipp*, 911 F.3d at 546 (citing *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999)); *see Faulkner*, 906 F.3d at 734 (finding an employee's requested accommodations unreasonable where the "suggested accommodations were not ones that would enable her to perform the essential functions of the [] position" but rather "would relieve her of those functions"). This is true even where, as here, the employee is approved for intermittent FMLA leave. *Evans*, 996 F.3d at 546–47 (quoting *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 n.4 (8th Cir. 2001)) ("'[I]ntermittent FMLA leave does not excuse an employee from the essential functions of the job,' such as the need for regular and reliable attendance."); *see also Spangler*, 278 F.3d at 853 (quoting *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1007 (7th Cir. 2001)) ("[T]he FMLA does not provide an employee [with a disability] . . . with a right to 'unscheduled and unpredictable, but cumulatively substantial, absences' or a right to 'take unscheduled leave at a moment's notice for the rest of [his] career.'").

Moreover, Higgins's suggestion that he understood USS to be accommodating his disability by modifying the Absenteeism Policy, as applied to him specifically, such that he was only "expected to call as soon as he was able to," ECF No. 45 at 9–10, is unsupported by the record. It is undisputed that Higgins was disciplined for absenteeism more than thirty times between July 2020 and April 2023. *See* ECF No. 30-10 at 2–8. And while USS admits that the twenty-minute advance-notice policy was not stated in a written document that was shared with employees, *see* ECF No. 30-3 at 28:3–7, it is undisputed that by September 28, 2022 (at the latest), Wiirre had expressly communicated to Higgins

21

that he needed to provide at least twenty-minutes notice if he was unable to make it to his shift, *see* ECF No. 30-1 at 54:16–56:9. Higgins was disciplined for late call-offs or unexcused absences on ten different occasions between the date of that September 2022 meeting and Higgins's April 2023 termination, with three of those instances occurring after Higgins was put on notice that he was subject to discharge for his absenteeism. *See* ECF No. 30-10 at 2–6. And in any event, the Eighth Circuit has explained that "[i]f an employer 'bends over backwards to accommodate a disabled worker . . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.'" *Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 943 (8th Cir. 2018) (en banc) (quoting *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995)).

Because Higgins's requested accommodation was unreasonable, Higgins cannot show he was qualified for his position at the time USS terminated his employment. *See Higgins*, 931 F.3d at 671; *Mobley*, 53 F.4th at 456. Consequently, Higgins cannot establish a prima facie case of disability discrimination, *see Goosen*, 105 F.4th at 1040, and thus both his disability discrimination and failure-to-accommodate claims necessarily fail,[8] *see Hopman*, 68 F.4th at 396. Accordingly, summary judgment in USS's favor is warranted as

---

[8] Even if Higgins could establish a prima facie case of disability discrimination, he has not offered any evidence sufficient to create a genuine dispute of material fact that USS's stated reason for terminating his employment—multiple violations of the Absenteeism Policy—was pretextual, which would also warrant summary judgment in USS's favor. *See Lors*, 595 F.3d at 834.

to Higgins's disability discrimination and failure-to-accommodate claims under both the ADA and the MHRA. *See Wilking*, 153 F.3d at 873.

### B.    Retaliation and Reprisal

Higgins alleges that USS retaliated against him for requesting accommodations. *See* ECF No. 1 ¶¶ 48–51, 61–64. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation, Higgins must show "(1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) a causal connection between the two." *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 924 (8th Cir. 2018) (alterations in original) (citation omitted).

USS asserts that Higgins cannot establish the causation element because "there is nothing in the record suggesting" that Higgins's request for accommodations was related to his termination. ECF No. 29 at 27–29. For his part, Higgins does not put forward any argument regarding his retaliation and reprisal claims under either the ADA or MHRA. *See generally* ECF No. 45 at 15–23. Accordingly, Higgins cannot establish a prima facie case of retaliation or reprisal, and for that reason, summary judgment in USS's favor is appropriate.[9] *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th

---

[9]    This conclusion is further supported by discussion at oral argument where counsel for USS related USS's understanding that Higgins had forfeited his retaliation and reprisal claims under both the ADA and MHRA. Counsel for Higgins did not refute USS's understanding and did not offer argument on those claims or an explanation for why Higgins had not addressed those claims in response to USS's summary judgment motion.

Cir. 2009)) ("The 'failure to oppose a basis for summary judgment constitutes waiver of that argument,' because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment.").

III.    **FMLA Claims**

The FMLA provides that an "eligible employee"—such as one with "a serious health condition that makes the employee unable to perform the functions of the position of such employee"—"shall be entitled to a total of 12 workweeks of leave during any 12-month period." 29 U.S.C. § 2612(a)(1). Employers are prohibited from interfering with an employee's rights under the FMLA in two ways: (1) employers may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA; and (2) employers may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. *Id.* § 2615(a)(1)–(2).

Higgins alleges that USS both interfered with his rights under Section 2615(a)(1) when it retroactively altered his time entries and retaliated against him for his use of approved FMLA leave under Section 2615(a)(2) when it terminated his employment. *See* ECF No. 1 ¶¶ 65–72. In the Eighth Circuit, "interference" claims under Section 2615(a)(1) are limited to "situations where the employee proves that the employer denied a benefit to which [he] was entitled under the FMLA," including by "terminating an employee while on FMLA leave." *Lovland v. Emps. Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012) (citation omitted). Such interference can also include "manipulation by a covered employer to avoid responsibilities under [the] FMLA." 29 C.F.R. § 825.220(b).

"Retaliation" claims, by contrast, are construed as "arising under the 'discrimination' prohibition of [Section] 2615(a)(2)." *Lovland*, 674 F.3d at 811. "The difference between the two claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Wisbey v. City of Lincoln*, 612 F.3d 667, 675 (8th Cir. 2010) (citation omitted). Thus, retaliation claims, but not interference claims, are "analyzed under the *McDonnell Douglas* burden-shifting framework at the summary judgment stage." *Lovland*, 674 F.3d at 811 (footnote omitted) (citation omitted).

While USS's disordered recordkeeping provides some appeal to Higgins's FMLA interference claim, there is no genuine dispute that Higgins had, in fact, exhausted his FMLA leave when Broadspire notified him of the exhaustion in September 2024. As for his FMLA retaliation claim, Higgins cannot establish a causal connection between his exercise of his rights under the FMLA and USS's decision to terminate his employment, nor that USS's proffered reason for terminating Higgins's employment—multiple violations of the Absenteeism Policy—was pretextual.

### A.    Interference

For Higgins's FMLA interference claim to survive summary judgment, Higgins must show that "(1) [he was] entitled to a benefit under the FMLA, (2) [USS] 'interfered with' that entitlement, and (3) the reason for the denial [of the benefit] was connected to [his] FMLA leave." *Black v. Swift Pork Co.*, 113 F.4th 1028, 1031 (8th Cir. 2024) (second alteration added) (citation omitted). In addition to the substantive elements of an FMLA interference claim, Higgins must be able to show "a reasonable likelihood that a rational

trier of fact would award . . . damages or find [an entitlement] to injunctive relief to avoid the entry of summary judgment." *Brandt v. City of Cedar Falls*, 37 F.4th 470, 478 (8th Cir. 2022) (alteration in original) (citation omitted); *see Elsherif v. Mayo Clinic*, No. 18-cv-2998 (DWF/KMM), 2021 WL 1634797, at *11 (D. Minn. Apr. 27, 2021) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)) ("[T]he FMLA does not provide relief 'unless the employee has been prejudiced by the violation.'").

Higgins has the initial burden of showing that he "was entitled to the benefit denied." *Black*, 113 F.4th at 1031 (quoting *Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012)). But "the FMLA does not impose strict liability on employers for interference claims." *Elsherif*, 2021 WL 1634797, at *12 (citing *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005)). Thus, if Higgins meets his initial burden of showing interference, including a showing of prejudice resulting from such interference, the burden shifts to USS to "prove there was a reason unrelated to [Higgins's] exercise of FMLA rights" for terminating Higgins's employment. *Id.* (citing *Throneberry*, 403 F.3d at 978–79).

Higgins argues that USS interfered with his rights under the FMLA when it "literally manipulated [his] 'zero' entries to 'eight' hours." ECF No. 45 at 17; *see* ECF No. 43-17 at 3; ECF No. 43-18 at 2. This manipulation, Higgins contends, resulted in Higgins being "charged" for more FMLA leave than he actually used on days when "he was only absent for a matter of minutes," even though FMLA regulations require that "the largest increment USS should have attributed to his FMLA leave would be an hour." ECF No. 45 at 17; *see* 29 C.F.R. § 825.205(a)(1) ("When an employee takes FMLA leave on an intermittent . . .

26

basis, the employer must account for the leave using an increment . . . that [] is not greater than one hour and . . . an employee's FMLA leave entitlement may not be reduced by more than the amount of leave actually taken."). Thus, according to Higgins, USS caused Higgins to prematurely exhaust his FMLA leave entitlement, which resulted in USS "subject[ing] him to closer scrutiny once his FMLA was exhausted." ECF No. 45 at 17.

USS argues that Higgins's FMLA interference claim fails because Higgins cannot identify "even one day on which USS incorrectly calculated his FMLA usage." ECF No. 47 at 3. USS contends that, in fact, Higgins's supervisors' failure to "timely and accurately record his FMLA usage resulted in [Higgins] using more FMLA than he was entitled to use." *Id.* at 2; *see* ECF No. 30-4 at 91:21–92:15. USS further argues that even if Higgins could show he had remaining FMLA leave in September 2022—when Higgins was notified he had exhausted his FMLA, *see* ECF No. 30-1 at 54:16–55:2—he cannot show that USS "would not have disciplined him or terminated his employment" for violating the Absenteeism Policy. ECF No. 47 at 3. USS also contends that Higgins "cannot point to any damages attributable to USS'[s] handling of his FMLA leave." *Id.*

As an initial matter, counsel for Higgins conceded at oral argument that Higgins was not harmed by USS's purported manipulation of Higgins's time entries. For that reason alone, summary judgment in USS's favor is appropriate. *See Elsherif*, 2021 WL 1634797, at *11 (explaining that the FMLA provides no relief "unless the employee has been prejudiced by" an FMLA violation). But even without that concession, Higgins's FMLA interference claim fails.

27

It certainly appears that USS's tracking of Higgins's FMLA leave was—in a word—sloppy, and its system for entering such leave time appears not to be compliant with FMLA regulations. *See* 29 C.F.R. § 825.205(a)(1). But while USS's alterations of his time entries ostensibly could be a facial violation of the FMLA, Higgins's assertion that those alterations caused him to exhaust his FMLA entitlement sooner than he otherwise would have in 2022 is contrary to the record. Broadspire first notified Higgins that he had exhausted his FMLA entitlement on or around September 8, 2022. ECF No. 30-15 at 2. But Koski did not instruct the USS accounting analyst to alter any of Higgins's time entries until September 21, 2022, nearly two weeks later, ECF No. 43-17 at 3, and there is no evidence in the record to suggest that USS changed any of Higgins's time entries before then.[10] In other words, the alteration of Higgins's time entries in late September could not have been a factor in Broadspire's determination that Higgins had exhausted his leave because Broadspire had already made that determination in early September—before USS altered the time entries.[11]

---

[10]     The second exhaustion notice Broadspire sent to Higgins on or around October 4, 2022, notifying Higgins that he had exhausted his FMLA entitlement about two months earlier than Broadspire indicated in the September 2022 notice, ECF No. 30-16 at 2, came after Koski's email to the USS accounting analyst and may have been influenced by the changes to Higgins's time entries. But there is no genuine dispute as to the fact that Higgins had exhausted his FMLA entitlement at least as of August 2022, as Broadspire initially determined.

[11]     Furthermore, even assuming Broadspire's determination that Higgins had exhausted his FMLA entitlement as of August 2022 was incorrect, Higgins was either late for or absent from work—without having provided timely notice—on at least five occasions between September 16 and October 25, 2022, for reasons that were unrelated to Higgins's medical condition and for which he was not entitled to use FMLA leave. *See* ECF No. 30-10 at 4–7; ECF No. 31-3 at 3–4, 13–15.

Higgins also broadly asserts that USS's retroactive changes to his time entries resulted in USS "attributing more FMLA leave to Higgins than he actually took."  ECF No. 45 at 17.  But as USS notes, Higgins does not identify a single change that USS made to his time entries that was inaccurate.  Higgins ultimately rests on mere denials regarding the accuracy of USS's changes, which is insufficient to survive summary judgment. *Carter*, 956 F.3d at 1059.

In sum, even if USS's retroactive alteration of Higgins's time records constitutes a technical violation of the FMLA (which the Court does not hold), there is no evidence that Higgins was harmed in a manner that entitles him to relief.  *See Brandt*, 37 F.4th at 478; *Elsherif*, 2021 WL 1634797, at *11.  Accordingly, summary judgment in USS's favor is appropriate.

### B.    Retaliation

The FMLA prohibits employers from "discriminat[ing] against an employee for asserting his rights under the act."  *Wisbey*, 612 F.3d at 676 (citation omitted).  Thus, employers may not base "an adverse employment action on an employee's use of [FMLA] leave."  *Id.* (alteration in original) (citation omitted).  To establish a prima facie case of retaliation under the FMLA, Higgins must show: (1) that he engaged in activity protected under the FMLA, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between his action and the adverse employment action. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007 (8th Cir. 2012) (citation omitted).  In other words, Higgins "must prove that his exercise of FMLA rights played a

part" in USS's decision to terminate him.  *Id.* (internal quotation marks omitted) (citation omitted).

Higgins argues that USS's termination of his employment in April 2023 was in retaliation for his filing a new claim for FMLA leave in March 2023, about three weeks earlier.  ECF No. 45 at 18.  To support his claim, Higgins cites Wiirre's January 2022 email stating that Higgins's use of FMLA leave was a "hardship" on USS.  *Id.* at 13.  USS maintains that it terminated Higgins for his repeated violations of the Absenteeism Policy and emphasizes that Higgins had been continuously approved for intermittent FMLA leave for more than five years preceding his termination.  ECF No. 47 at 3–4.

Higgins has not met his burden of showing USS had a retaliatory motive related to his exercise of his rights under the FMLA.  Higgins largely relies on the temporal proximity between his filing the new FMLA claim and his termination the following month, but "[g]enerally, more than a temporal proximity between protected activity and termination is required to present a genuine issue of fact for trial."  *Malloy v. U.S. Postal Serv.*, 756 F.3d 1088, 1091 (8th Cir. 2014) (citation omitted); *see also Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346 (8th Cir. 1996) (rejecting "the mere coincidence of timing" as a basis for raising an inference of causation by itself).  USS is correct—and Higgins does not dispute—that each of Higgins's FMLA claims had been approved, starting with his first claim in fall 2017 until he was terminated in April 2023.  Higgins also does not dispute that he was able to use his approved FMLA leave during that period.  And there is no genuine dispute that the only time Higgins *could not* use FMLA leave was the period beginning in September 2022—because Higgins had exhausted his FMLA entitlement as of August 2022.  ECF

30

No. 30-15 at 2. Moreover, Higgins was disciplined on numerous occasions spanning several years for violations of the Absenteeism Policy. In fact, after Higgins was notified that he risked being discharged for several of those violations in November 2022, Higgins was cited for three additional violations of the Absenteeism Policy before he was terminated in April 2023, *see* ECF No. 30-10 at 2, which further "undercuts the significance of the temporal proximity." *Malloy*, 756 F.3d at 1091 (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1001 (8th Cir. 2011)).

Even if Higgins could establish a causal connection between his filing a new FMLA claim and his termination the following month, the analysis does not end there on his retaliation claim because the *McDonnell Douglas* burden-shifting framework applies to that claim. *See Lovland*, 674 F.3d at 811. USS has proffered a legitimate, nondiscriminatory reason for terminating Higgins's employment: Higgins's repeated violations of the Absenteeism Policy. *See, e.g.*, ECF No. 30-5 at 11:11–14, 81:12–18. But Higgins has not presented any evidence sufficient to show that USS's justification for terminating his employment was mere pretext. *See Lovland*, 674 F.3d at 811. And the fact that Higgins was consistently approved for FMLA leave without repercussions, including in the time before USS transitioned the administration of FMLA leave to Broadspire in 2020, further undermines any inference that USS had a discriminatory or retaliatory motive when it decided to terminate his employment. *See Malloy*, 756 F.3d at 1091 (finding that an employee's use of FMLA leave "without repercussions[] suggest[s] that the employer was not hostile to the protected activity"); *Evans*, 996 F.3d at 551–52 (same).

31

Because Higgins can neither establish a causal connection between the exercise of his rights under the FMLA and the termination of his employment by USS nor that USS's proffered justification was pretext, he cannot establish a prima facie case of retaliation under the FMLA. *See Pulczinski*, 691 F.3d at 1007; *Lovland*, 674 F.3d at 811. Accordingly, summary judgment in USS's favor is warranted.

## CONCLUSION

Given the undisputed facts in this case, Higgins cannot establish a prima facie case for any of his claims under the ADA, the MHRA, and the FMLA. As a result, USS's motion for summary judgment is granted in its entirety, and Higgins's claims are dismissed with prejudice.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this matter, **IT IS HEREBY ORDERED** that:

1.    USS's Motion for Summary Judgment (ECF No. 27) is **GRANTED**; and

2.    Higgins's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE** in its entirety.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 15, 2025                    *s/Laura M. Provinzino*
                                       Laura M. Provinzino
                                       United States District Judge